United States Court of Appeals
**FOR THE EIGHTH CIRCUIT**

_____

No. 97-1041

_____

| | | |
|---|---|---|
| Reginald Morgan, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| v. | * | |
| | * | Appeal from the United States |
| John Rabun; Lori Derosear, D.O.; | * | District Court for the |
| John Twiehaus; Myra Ward, R.N.; | * | Eastern District of Missouri. |
| Jerlean Williams, R.N.; Wardell Hardy, | * | |
| R.N.; Ron Scharer, R.N.; Rosemary | * | |
| Gardner, R.N.; Theodor Rankin, II, | * | |
| L.P.N.; Willie Thomas, R.N., | * | |
| | * | |
| Appellees. | * | |

_____

Submitted:  September 12, 1997
Filed:  November 10, 1997

_____

Before BOWMAN, Circuit Judge, HENLEY, Senior Circuit Judge,[1] and MORRIS
    SHEPPARD ARNOLD, Circuit Judge.

_____

BOWMAN, Circuit Judge.

_____

[1]Judge Henley died on October 18, 1997.  This opinion is consistent with his
vote at the panel's conference following oral argument of the case on September 12,
1997.

Reginald Morgan filed suit under 42 U.S.C. § 1983 (1994) claiming that Dr. John Rabun and his staff administered psychotropic drugs to Morgan against his will in violation of his rights under the Due Process Clause of the Fourteenth Amendment. Dr. Rabun was Morgan's treating physician at the St. Louis State Hospital, where Morgan had been committed. The District Court[2] granted summary judgment in favor of the defendants. Morgan now appeals the judgment of the District Court. We affirm.

I.

In November 1992, Morgan was indicted for first degree assault, armed criminal action, and unlawful use of a weapon. Morgan had allegedly stabbed a man with a butcher knife. The state trial court found that based upon a psychiatric evaluation of Morgan, he "lack[ed] the mental fitness to proceed" with trial and ordered Morgan committed for evaluation to the custody of the Director of the Department of Mental Health. Appellant's App. at 737. Morgan was admitted to St. Louis State Hospital on February 22, 1993.

In March 1994, the court ordered that Morgan stand acquitted of the charges "on the ground of mental disease or defect excluding responsibility." Id. at 739. The court committed Morgan "for care and treatment" to the Director of the Department of Mental Health. Id. The court noted that Morgan "suffers from Schizophrenia Chronic Paranoid Type." Id. at 738.

Dr. Rabun was Morgan's treating physician at the State Hospital from February 22, 1993 until August 11, 1994. Upon Morgan's admission on February 22, Dr. Rabun performed a psychiatric examination and filled out an assessment report. In the report, Dr. Rabun wrote:

---

[2]The Honorable Jean C. Hamilton, Chief Judge, United States District Court for the Eastern District of Missouri.

The patient was uncooperative in general and evidenced an aloof/suspicious demeanor. . . . The patient was markedly hostile on exam and even began the interview by stating "I am hostile." The patient made numerous threats during the interview . . . [like] "you are nagging me like an animal, usually people get in trouble when they nag me like an animal." The patient stated that he had "homicidal ideas but I am not going to tell you about any of that." . . . The patient . . . had the evident hostile and threatening demeanor.[3]

Id. at 699-700. Morgan also admitted to Dr. Rabun that he had previously been convicted of murder and served time in the state penitentiary. Id. at 697. Based upon "the nature of the charges against him and his hostility towards [Dr. Rabun] and overt threats," Dr. Rabun found Morgan "obviously dangerous to others" and authorized forced medication. Id. at 701. On February 22, he was given an injection of psychotropic medication.

The second occasion on which Morgan was forcibly administered psychotropic medication was July 21, 1993. Morgan had become agitated in the patient lounge and began knocking pool balls and swinging a pool cue. He tore the net off of a ping pong table and tried to tear the metal brackets. Morgan told the staff, "I'm losing my mind, I'm going crazy, I can't control myself." Id. at 570. Morgan admits making these statements. Morgan Aff. para. 6. Dr. Rabun ordered an injection and five-point leather restraints "so that both the patient and others would not be in danger." Rabun Aff. para. 14.

Except for the two forced injections, Morgan typically drank his oral medication without incident. On occasion Morgan would refuse or spit out the medication.

---

[3]Although Morgan admits he told Dr. Rabun he was hostile, Morgan denies saying "that [he] had homicidal ideas or that 'people who keep nagging me like animals could get hurt,' or any statements of similar import." Morgan Aff. para. 4.

Morgan admits, however, that the medications were never forcibly administered when he refused to comply with his treatment.  Morgan Dep. at 31-32.

## II.

Morgan claims that Dr. Rabun administered these psychotropic medications in violation of the Due Process Clause of the Fourteenth Amendment.  Specifically, Morgan argues that Dr. Rabun violated his substantive due process rights on the two occasions when Morgan was forcibly injected.  Morgan also asserts that Dr. Rabun's decision to treat Morgan involuntarily with psychotropic medications on a daily basis violated his procedural due process rights.  Because we agree that the undisputed facts establish that Morgan's due process rights were not violated, we affirm the District Court's grant of summary judgment.

We review a grant of summary judgment de novo.  See Coplin v. Fairfield Pub. Access Television Comm., 111 F.3d 1395, 1401 (8th Cir. 1997).  Summary judgment is proper if, taking all the facts and reasonable inferences in the light most favorable to the non-moving party, "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).

We must determine whether Morgan's evidence is sufficient to allow a reasonable jury to find that Dr. Rabun violated Morgan's due process rights.  The issue necessarily has "both substantive and procedural aspects."  Washington v. Harper, 494 U.S. 210, 220 (1990).  The substantive issue involves defining the protected constitutional interest, as well as identifying the conditions under which competing interests may outweigh it.  See Mills v. Rogers, 457 U.S. 291, 299 (1982).  The procedural issue concerns the minimum process required by the Constitution.  See id.

## A. Substantive Due Process

Under the Due Process Clause of the Fourteenth Amendment, there is no doubt that Morgan "possesses a significant liberty interest in avoiding the unwanted administration of antipsychotic drugs." Harper, 494 U.S. at 221-22. Psychotropic drugs alter the chemical balance in a patient's brain and can produce serious, even fatal, side effects. See id. at 229. Notwithstanding these facts, an individual's liberty interest in avoiding forcible administration of psychotropic drugs is not unconditional. We must balance this liberty interest against the relevant state interests to determine whether Morgan's constitutional rights were violated. See Youngberg v. Romeo, 457 U.S. 307, 320-21 (1982).

Before we discuss the federal constitutional aspects of substantive due process, however, we must first determine to what extent, if any, Missouri's applicable state laws provide additional protections.[4] The Federal Due Process Clause defines only the minimum protections required. State law, however, may recognize more extensive liberty interests than the Federal Constitution. See Mills, 457 U.S. at 300. These state-created liberty interests are entitled to protection under the Fourteenth Amendment's Due Process Clause. See id. Regarding the two instances of forced injections, the relevant Missouri statutes read in pertinent part:

> 1. No patient, resident or client of a residential facility or day program operated, funded or licensed by the department [of mental health] shall be subject to physical or chemical restraint, isolation or seclusion unless it is determined by the head of the facility or the attending licensed physician to be necessary to protect the patient, resident, client or others.

---

[4]In their briefs, neither party discusses relevant Missouri state law and its potential effect on the substantive due process question. We engage in the discussion because "[f]or purposes of determining actual rights and obligations . . . questions of state law cannot be avoided." Mills v. Rogers, 457 U.S. 291, 300 (1982).

Mo. Rev. Stat. § 630.175.1 (1986).  Chemical restraint is defined as:

> [M]edication administered with the primary intent of restraining a patient
> who presents a likelihood of serious physical injury to himself or others,
> and not prescribed to treat a person's medical condition.[5]

Mo. Rev. Stat. § 630.005.1.(3) (Supp. 1991).  These Missouri statutes create no
additional rights that extend beyond the Federal Constitution.  The statute requires no
more than the constitutional requirement discussed infra--a finding that the patient
presents a danger to himself or others.  Therefore, the Federal Due Process Clause sets
the standard by which to determine whether Dr. Rabun violated Morgan's substantive
rights.

The Supreme Court has held that "given the requirements of the prison
environment, the Due Process Clause permits the State to treat a prison inmate who has
a serious mental illness with antipsychotic drugs against his will, if the inmate is
dangerous to himself or others and the treatment is in the inmate's medical interest."
Harper, 494 U.S. at 227.  The governmental interests in running a state mental hospital

---

[5]The District Court stated that section 630.175.1 and section 630.005.1(3) did
not apply "[b]ecause [Morgan] received the involuntary injections of haldol and
prolixin as part of a treatment regimen and not as a form of chemical restraint."
Morgan v. Rabun, No. 4:94CV909, Mem. and Order at 8 (E.D. Mo. Nov. 26, 1996).
However, upon examination of Dr. Rabun's actual prescription orders, it seems clear
that the forced injections were used as a form of chemical restraint.  See Appellant's
App. at 705.  Dr. Rabun ordered Haldol and Ativan intramuscular (by injection) or
orally "prn-agitation," meaning as needed for agitation.  Id.  He added that the two
medications could be given concurrently.  See id.  In addition, Dr. Rabun wrote a
standing order for oral Haldol to be taken at bedtime everyday, see id., which he later
changed to Prolixin.  See id. at 712.  Injections of Haldol and Ativan were to be given
only if Morgan became agitated--these were not part of his daily treatment regimen.
Rather, the "primary intent" of the injections was to restrain Morgan if he got out of
hand. The standing orders for daily, oral Haldol and Prolixin, rather than the injections,
were for treatment purposes.

are similar in material aspects to that of running a prison. Administrators have a vital interest in ensuring the safety of their staff, other patients, and of course in ensuring the patients' own safety. Thus, we apply the Harper standard to this case. If Dr. Rabun found Morgan to be a danger to himself or others, then Morgan's substantive due process rights were not violated.

Our role is not to determine conclusively that Morgan was indeed dangerous. Rather, we must simply make certain that Dr. Rabun exercised professional judgment in making the determination that Morgan was dangerous. See Youngberg, 457 U.S. at 321 (adopting the standard that "the Constitution only requires that the courts make certain that professional judgment in fact was exercised"). To a limited extent, this requires us to examine the bases upon which Dr. Rabun made such a determination. See Cochran v. Dysart, 965 F.2d 649, 650-51 (8th Cir. 1992) (remanding case to district court for review of documents on which treating doctor relied in authorizing involuntary medication). We start from a presumption that the decisions made by professionals are correct. See Youngberg, 457 U.S. at 323.

We find that on both instances when Morgan was forcibly injected, Dr. Rabun exercised his professional judgment in determining that Morgan was dangerous. The first time Morgan was injected was upon his admission to the hospital. Dr. Rabun determined that Morgan was dangerous based upon the nature of the crime that led to his commitment and his hostile demeanor. Morgan denies saying that he had homicidal ideas or that he made any threats when he was admitted. He claims this is a question of fact that should be decided by a jury. But even if we accept Morgan's self-serving denials as true, there is still enough other evidence to satisfy us that Dr. Rabun exercised his professional judgment in concluding that Morgan was dangerous. Morgan had just been committed to the state hospital for stabbing a man based upon active psychotic beliefs. Prior to that, Morgan also had committed murder. In the admission interview, Dr. Rabun had detailed his observations of Morgan and recorded portions of their conversations. The assessment report clearly indicates Morgan was

unstable and potentially dangerous. In fact, Morgan admits telling Dr. Rabun in the interview that he was hostile. Finally, Morgan points out that he had been in city jail for six months prior to his hospital admission without medication and did not cause injury to himself or others. But the fact that Morgan was in such a volatile atmosphere for six months, unmedicated, and harboring active psychotic beliefs actually weighs in favor of Dr. Rabun's determination that he was potentially dangerous.

The second occasion on which Dr. Rabun authorized a forced injection was when Morgan began swinging a pool cue, knocking pool balls, and tearing up a ping-pong table in the patient lounge. Morgan told the staff he was going crazy and losing control. In this situation, Dr. Rabun clearly exercised professional judgment in determining that Morgan was a danger to himself and others. Even though Morgan claims it was his medication that caused him to lose control, he is not qualified to make this determination. See Kayser v. Caspari, 16 F.3d 280, 281 (8th Cir. 1994) (noting that self-diagnosis alone cannot establish a medical fact). And even if Morgan did not threaten anyone personally and destroyed only "property," we do not require that someone actually suffer injury before medication can be authorized.

## B. Procedural Due Process

Morgan claims his procedural due process rights were violated when Dr. Rabun decided to treat Morgan with antipsychotic drugs for almost eighteen months. Procedural due process involves ascertaining "whether the State's nonjudicial mechanisms used to determine the facts in a particular case are sufficient." Harper, 494 U.S. at 220. From February 22, 1993 through August 11, 1994, Dr. Rabun and his staff administered oral medications to Morgan. On most occasions, Morgan took the medications. Morgan contends, however, that on each day he took his medications orally, it was involuntary.

-8-

Like substantive due process, procedural due process is intertwined with state law issues. See Mills, 457 U.S. at 299. Therefore, we must begin this discussion by determining whether Missouri has conferred procedural protections that extend beyond the minimum constitutional requirements. See id. at 300.

Morgan is alleging a procedural due process violation only with respect to the daily, oral doses of medication. The applicable Missouri statute reads:

> Subject to other provisions of this chapter, the head of a mental health or mental retardation facility may authorize the medical and surgical treatment of a patient or resident under the following circumstances:
>   (1) Upon consent of a patient or resident who is competent;
>   (2) Upon consent of a parent or legal guardian of a patient or resident who is a minor or legally incapacitated;
>   (3) Pursuant to the provisions of chapter 431, RSMo;
>   (4) Pursuant to an order of a court of competent jurisdiction.

Mo. Rev. Stat. § 630.183 (1986) (emphasis added). The procedures set forth in this statute create no additional constitutionally protected interests. In Hewitt v. Helms, 459 U.S. 460, 472 (1983), the Supreme Court held that state laws setting forth procedural restrictions take on constitutional significance only if those laws contain "explicitly mandatory language in connection with requiring specific substantive predicates."

The Supreme Court has rejected the Hewitt methodology when the source of the claimed liberty interest derives from a prison regulation. See Sandin v. Connor, 515 U.S. 472, 480-84 (1995). The Supreme Court held that instead of searching for mandatory language in a prison regulation, courts should examine whether the claimed violation "present[s] the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." Id. at 486. Sandin, however, does not apply to

this case. In <u>Sandin</u>, the Court specifically limited its reasoning to prison regulations:

> [The search for negative implication from mandatory language] may be entirely sensible in the ordinary task of construing a statute defining rights and remedies available to the general public. It is a good deal less sensible in the case of a prison regulation primarily designed to guide correctional officials in the administration of a prison.

<u>Id.</u> at 481-82. Here we are dealing with a state statute promulgated under a scheme which delineates its goals solely "for the citizens of this state," i.e., the general public, rather than a prison regulation. Mo. Rev. Stat. § 630.020.1 (1986). Moreover, the Supreme Court reasoned that prison regulations should be analyzed differently than other statutes because "such regulations [are] not designed to confer rights on inmates." <u>Sandin</u>, 515 U.S. at 482. The Missouri legislature specifically placed section 630.183 under the "Patients' Rights" section. Thus, this is not the type of statute to which the <u>Sandin</u> "atypical, significant deprivation" analysis was intended to apply.

Because <u>Sandin</u> does not apply, we return to the <u>Hewitt</u> analysis. Section 630.183 does not use "mandatory" language in describing limits placed upon state officials' conduct. <u>See</u> <u>Dautremont v. Broadlawns Hosp.</u>, 827 F.2d 291, 299 (8th Cir. 1987). Instead, the statute uses the word "may," as opposed to "may only." This is discretionary language. <u>See</u> <u>id.</u> (finding "may" language discretionary); <u>cf.</u> <u>Hewitt</u>, 459 U.S. at 471-72 (finding language such as "shall," "will," or "must" mandatory).

The statute does not create a federally protected liberty interest in its procedures. Therefore, we look only to the Due Process Clause in determining what minimum procedures are required. In determining what procedures are required under the Due Process Clause, we balance the private interest at stake, the risk of erroneous deprivation of such interest, and the governmental interests involved. <u>See</u> <u>Mathews v. Eldridge</u>, 424 U.S. 319, 335 (1976).

-10-

We need not perform the <u>Mathews</u> balancing test, however, because Morgan's evidence fails to create a fact issue as to whether he took these oral medications voluntarily. Morgan claims his compliance was involuntary because he feared that his refusal to cooperate would result in the forced administration of the medication. But Morgan admits that he was never forced to take the medicine when he <u>did</u> refuse to comply. Moreover, nothing in the record establishes that Dr. Rabun knew Morgan was taking the medicine out of fear. Only if Morgan had made Dr. Rabun aware that his consent was involuntary could Dr. Rabun have attempted to jump through any necessary procedural hoops. <u>See</u> <u>Doby v. Hickerson</u>, 120 F.3d 111, 113 (8th Cir. 1997). There is simply nothing in the record to suggest that Dr. Rabun forcibly administered these oral doses.

In fact, the record suggests the opposite. For instance, on April 12, 1993, when Dr. Rabun changed Morgan's daily medication from Haldol to Prolixin, he wrote "[Patient] requesting a [change] in medications. Wants to [discontinue] his Haldol and agrees to a trial of Prolixin; side effects explained to [patient] . . . ." Appellant's App. at 712. This suggests Morgan was taking both medications on a voluntary basis and shows that Dr. Rabun honored Morgan's request to stop taking Haldol. Morgan cannot now simply rest on bare assertions. Otherwise, plaintiffs such as Morgan could avoid summary judgment merely by asserting they took their prescribed medication out of fear. There was no constitutional violation because the record shows that Morgan voluntarily took his medication.

In conclusion, we hold that Dr. Rabun did not violate Morgan's substantive due process rights, nor did he violate Morgan's procedural due process rights. Accordingly, we affirm the District Court's grant of summary judgment.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT

-11-